Good morning. May it please the court. James Jenkins on behalf of the Petitioner. Hermione Just seven months ago, this court decided Ramos v. Bondi, a case that I think controls the outcome here. In fact, I think in a number of ways Mr. Martinez's case is even more compelling than Ms. Ramos's. The evidence in this case was overwhelming. There were some 1,500 pages of evidence, including expert witness reports, expert testimony, country conditions reports, scholarly articles, statistical analyses, and based on this voluminous evidence, two different immigration judges concluded that Mr. Martinez would likely be tortured if removed to Mexico. The IG's decision here is ten pages, single-spaced, small print, packed with detailed factual findings, all supported by citations to evidence in the record. But the Board of Immigration Appeals summarily wrote it all off as clearly erroneous, with just a couple of sentences of boilerplate by way of explanation. And courts have held that that's not enough, that the board has to give more than just conclusory statements, that the board has to grapple with the evidentiary record, and has to give specific, cogent reasons for overturning NIJ's factual findings. But the board didn't do that here. The board couldn't do that here because the findings are strongly supported by the record, and they're not clearly erroneous. Now the board said it was applying clear error review here, but we know it wasn't. We know that because in Ramos, the court told us three telltale signs of when the board is not really applying clear error review. Number one, it ignores key factual findings. Number two, it emphasizes certain facts in the record over others. And number three, it fails to explain how the IJ's findings are illogical, implausible, or not permissible based on the record. The board does all three of those here, and ultimately, as the government argues repeatedly in its brief, what this case boils down to is that the board merely disagreed with the IJ's findings. And in Ramos, the court tells us that disagreement with a factual finding does not make it clearly erroneous. The court noted in Ramos that clear error is, quote, a high bar, and, quote, no easy hurdle to clear. A factual finding has to be, quote, elusively wrong. As long as the IJ's view of the evidence is permissible or plausible, it has to be affirmed, even if the BIA disagrees with it. Well, in Ramos, we took an unusual step, which was to reinstate the asylum grant. Quite unusual step, warranted in that case. You asked for the same relief here. Why should that be the case, assuming you prevail on your clear error argument? Thank you, Your Honor, and I'm happy to address that. First of all, I think the legal issue is the same. The fact is, if you apply clear error correctly, there's only one possible outcome. The IJ's findings have to be affirmed. So, there's no reason to remand, remand with a futile, just as in Ramos. And this goes to, I beg your pardon, Your Honor? And I did want to point out some differences here between this case and Ramos that I think actually are making it, in a way, stronger than in Ramos. First of all, in Ramos, the case had been before the IJ and the board twice each already. In this case, it's already been before the board of the IJ three times each. The record is fully developed. At the third merits hearing, the parties agreed that no additional testimony was necessary. In Ramos, it cites a Third Circuit case called Yusupov, where the court said, we're not going to give the BIA a third bite at the apple. Here, we'd be talking about a fourth bite at the apple. And I think at some point, it comes time to draw a line. Secondly, I think in Ramos, one very important distinction, Ramos involved asylum, which is a discretionary form of relief. It's within the agency's discretion to grant. And yet, as you said, Your Honor, the court took an extraordinary step of remanding with instructions to grant this discretionary form of relief. Here, deferral of removal under CAT is mandatory. Once a petitioner meets the regulatory standard for it, it has to be granted. And two different immigration judges, independently looking at this record, both came to the conclusion that he had satisfied that burden and that it had to be granted. So I think the fact that it's mandatory versus discretionary in Ramos is another reason. Third reason, in Ramos, the court stressed the fact that the case had been hanging over Ms. Ramos' head for 10 years. But I would like to point out, the reason her case went on for so long is because she was on a non-detained docket, so her case moved slower. She was at liberty in the community. She was living with her family, her children, building a life for herself, etc. By contrast, Mr. Martinez has spent the last 39 months in a cell waiting for the outcome of this case. The conditions of that ICE facility, judges in the District of Colorado have called, quote, abhorrent and have said are indistinguishable from criminal confinement. So while Ms. Ramos' case hanged over her head for 10 years, I'm sure it felt like a long time to her. I would really wager that Mr. Martinez' case has felt considerably longer to him. And I would also point out that although Ramos does stress the length of time and does cite, I think, cases from the First Circuit and the Eighth Circuit where there had been a similar long period of time, there are plenty of other cases more in line with this time frame where courts have remanded with directions to grant. For example, in the Ninth Circuit, the Soto-Soto case from 2021, that case similarly had been pending about three and a half years. It was another clear error case. The court remanded with instructions to grant. The Fourth Circuit case, Mauricio Vasquez from 2018, that had been pending for about two and a half years. So although Ramos does stress the time, the 10-year time frame, I don't think there's any requirement in the case law that a case be pending for any particular period of time before a court decides to put an end to it. And I think here, just the fact that it has been before the agency three times already, talking about the ordinary remand rule, the discussion in Ramos, the court said, the Supreme Court and INS V. Ventura, normally we have to give the board the first chance to address something. They've had that chance. And they, frankly, they blew it. They did not apply clear error review here. And there's just no point in sending it back and asking them to do it again. This court can do just as it did in Ramos and can apply the clear error review here. Implicit in what you're saying is that there's, if we remanded to the BIA, there's no way it could explain itself better to defend its statement that there was clear error. I don't believe so, Your Honor. And I think it's useful to look at the Second Circuit decisions in Wu Lin and in, excuse me, in Vialta-Martinez, where it talks about examples of what constitutes clear error. Things like where there's no factual support of the record or the facts in the record explicitly contradict a factual finding or a judge misheard or misunderstood testimony. This is not the kind of thing that happened here. I think, you know. How do we know that? I mean, for. I'll telegraph how I'm feeling. I think they clearly didn't explain why it was clearly erroneous. The BIA goofed, it seems to me. But does that mean that they couldn't spend more time on it and explain on this record why the decision of the IJ was clearly erroneous? For example, it may be, I'm not sure what happened in the cross-examination of the experts, but if the experts, despite their opinions, didn't have any data of what the percentage of time this happens, what the percentage of time this happens, and accumulate that to show and not be able to show, that it was really more likely than not that the petitioner would be tortured on remand. Can we say for sure that there's nothing the BIA could do to explain why the IJ's decision was clearly erroneous? Frankly, I think we can, Your Honor. If you look at the record, I think it is plain that there is really no way you could make this be clearly erroneous. I think if you look at Ramos, what the board did there, in community. Let's take this case. I mean, you said there's hundreds of pages. You have expert testimony. Do you think the BIA would have had to reverse the IJ for being clearly erroneous if the IJ had ruled opposite of what it did? That's a good question. Of course, on clear error view, it still would have been the same. It should have been clear error view the other way, even if the judge had ruled against Mr. Martinez. But clear error view is extremely deferential. So if the IJ had ruled the other way, it's difficult to predict what the board would have done. I think still, under substantial evidence review, just like in Ramos, in footnote 16 of Ramos, it talks about even under substantial evidence review in Ramos, this court still would have reversed. I think it would have been the same result here, because I think the evidence is just so overwhelming. It's so one-sided. You keep saying it's so overwhelming, but that was not necessary in your brief to show that the BIA goofed in finding it clearly erroneous. But you didn't go through all the evidence and explain how it could overcome any objection. And the thing that interests me about the facts in this case is what sort of data the experts had when they said, this is very likely, this is very likely. Now, what's the data? There were 50 people that fit this demographic, and 40 of them were tortured. I don't know. They may have evidence like that. But it seems to me conceivable that the BIA, in going through the record, could say, this record just does not—it shows that it's a likelihood it was being tortured. There are all these factors, and there were a number of them that the experts pointed to. But the determination is whether it's more likely than not that more than half of the people with this demographic, with all these factors, would be tortured, and they just don't have that data. Why is that impossible here? Your Honor, I think it just, again, comes back to the deferential standard that you would have to say that the IJ's findings are illogical, implausible, or not permissible based on inferences from the record. And I don't think you can get to that conclusion. Even if the experts had no data to support what their opinions were? In a hypothetical scenario, even there, I don't know because— I don't want to be hypothetical. You're probably familiar, very familiar, with the transcript of the experts' testimony and their reports and the cross-examination and so on. Correct, Your Honor. And actually, the BIA, in this case, in its first decision, page 504 of the record, did make clear that it is the IJ's—it's within the IJ's purview. It's her decision whether to admit expert testimony, what weight to give it, et cetera. The second IJ in this case concluded that the report and the testimony was relevant, was probative, was consistent with the country conditions. The BIA already affirmed that in its second decision. That's page 126 of the record. The Board already affirmed Dr. Slack as an expert in these areas. So I don't think there would be a basis, really, to conclude at this point to go back and say that something was wrong with— I mean, he backed up his report. I think he had spent over 10 years researching these issues at the Board. He had written a book about it called Deported to Death, studied these issues in depth. We've seen lots of experts there. We don't always agree with the experts, and juries don't always agree with the experts. Sure. And that gets back to Fialta-Martinez. In that case, that was a second circuit case from last year where the Board sort of dismissed the expert testimony and just said it was too general. And again, the court in that case said that wasn't good enough. That was a conclusory statement. Considering that the expert testimony was substantiated by the country conditions evidence, the Board needed to do more. But I think what's important here to note is that the Board doesn't even mention the expert report. It doesn't mention the expert testimony. It just ignores it completely. If there was some basis to overturn the IJ's decision based on what was in the testimony or the report, I assume the Board would have put it in its decision. Well, you really, I mean, had our decision in Ramos, was that before the BIA issued its opinion in this case? It was after, Your Honor. So they may have thought, you know, we can be sloppy about this. They clearly were sloppy about it, but sometimes people take shortcuts all the time when they don't think it's going to make a difference. And, Your Honor, I think the errors they made in Ramos were of a different kind. They reweighed the evidence. They really went through the evidence more rigorously and reweighed it more rigorously, which in CABA, of course, this Court had said reweighing of evidence also is not clear error. So they made a different sort of error here. But if Your Honor was suggesting if we remand it and they do a rigorous review of the evidence and reweigh it in some way like they did in Ramos and try to recast it in some way where it makes the IJ looks to be clearly erroneous, then it's going to run afoul of Ramos. They're going to have reweighed the evidence, you know, basically reweighed it and tried to come to a different conclusion than what the IJ came to. And it's still not going to be clear error review. One of the distinguishing factors between this case and Ramos, too, is that in Ramos, you know, there was really an absence of a contrary argument from the government about the performance of clear error review. And here, the government strongly endorses that the clear error review was applied and applied correctly. So what do we do with that? Your Honor, the government says that just like the BIA says it, but they don't really back it up. They don't really explain how it was correctly applied. They just parrot the conclusion that it was repeatedly that it was applied. They don't really explain how. And all the cases that they cite, too, I think all but one, were cases under the substantial evidence standard. They weren't cases under clear error review. So they're really not, because they're under a different standard of review, they're really not apposite here, I think. Actually, could you help me with that, too? It seems like the, and I was going to ask the government this question as well, that the briefs seem to be talking past each other with respect to the standards. So your initial issue focuses on the application or misapplication of clear error. The government responds with substantial evidence. How should we be thinking about that here? Correct, Your Honor. This court, as an initial matter, determines as a matter of law de novo whether the board correctly applied clear error review. De novo, yes or no, did they apply it correctly? If they did not apply it correctly, then we're at Ramos, then we decide, do we remand or do we decide it here? If they did apply clear error review correctly, then we go to the next stage of the analysis, which is, does substantial evidence support the board's decision? And again, I think what it says in Ramos, again, here, this would fail even under substantial evidence review. But if I could reserve any time for rebuttal, thank you. Good morning, Your Honors. May it please the court, Andrea Jeavis on behalf of the Attorney General. I've already telegraphed my thoughts here, and you may want to put things in context with some opening remarks. But at some point, I'd like you to explain how to defend the BIA's decision to just say this was generalized evidence when there were so many specifics about the person and all that stuff. It's, you've got a tough road to hoe. I'm not saying you can't do it. I want you to try, but that's going to be important for me, at least. I'm going to try. First, I'd like to note that the board member was the same board member in all three decisions. So he was well-versed in this case, as opposed to the IJs, which were three different IJs. Not providing an excuse, but just want to point that out to the court. So how the government defends it is, we're going on to page. And I'm going to reference the board decisions. We're on page four of the record. And we start to the extent that the immigration judge rendered a predictive factual finding. And it is clearly erroneous. It's introducing the standard, Your Honor. And it is citing and incorporating the IJ decision at pages five to nine. And again, like I said, this is the board member who's seen this case three times. And then he goes into the IJ's factual findings on the next paragraph, starting with the immigration judge determined that. Those are the factual findings he is finding clearly erroneous. And then on the third paragraph, right below that, he is saying, these are the legal conclusions based on, which is a de novo review for the board. And that is why this respondent, it says, cited evidence does not adequately support a finding respondent is more likely than not to be tortured. That is the legal conclusion. So if you incorporate and take those paragraphs taken together, he is using the clear error standard correctly. And that would be the government's position. He's reciting it correctly. Right. And then he's diving into the factual findings and using those factual findings. And he says why. Evidence of pervasive cartel violence and gang crime does not adequately address, which goes to the factual findings in the paragraph above. So he is explaining it. Well, and we've said the same thing repeatedly. But there was a lot more than general statements about gang violence. The experts talked about this is what will happen when he crosses the border, given his tattoos, given his mental condition, things like that. That's not generalized statements of gang violence. That was pretty specific. And that is why he's incorporating those immigration judges' decisions, which did go in pages five through nine, do dive into the more specifics of the case. However, if this court would not find that the board had clear error. You don't have to give up yet. I just was reading your face, Your Honor. Apologies. It also goes to, then I would try the second round on page five. I mean, attorneys do change our minds in oral arguments. I know we do, Your Honors. It would be the same thing on the acquiescence paragraph, which starts to the extent he points out it's clearly erroneous, goes into the immigration judge's factual findings and then says why it's wrong. And then using its de novo legal conclusion says it does not support a determination that the police would acquiescence to the respondent's future torture. Those are all clear errors. He's pointing it out, pointing out the factual findings, incorporating those immigration judge decisions, as well as record evidence and DHS's appeal brief, and then finds that it was clearly erroneous and then dives into the merits of the case. But I would like to point, if the court does not, although the government stands strongly that he did, the board member who did see this three times and notably, he did remand this once to the IJ for further factual findings. And analysis. So he was clearly trying to get the job done right. Do you have authority that allows us to rely on the identity of the board member? I do not know that answer, Your Honor. So you're providing that just as anecdotal background. Yes, just for a background fact that he is the same board member that was on all three cases. Like, it's a 2,500 page record. This is a very complex case. Having someone who has seen it a few times and even remanded it back to the immigration judge to try to get it right is beneficial. But the government would also like to distinguish Ramos. Like Judge Rossman said, first of all, it's an asylum versus cat deferral case. This is a cat deferral case. That was a three. This is a three. Which would make it a stronger case for remand, right? For remand, this would be a stronger case for remand because it's mandatory. Correct. And Petitioner keeps mentioning the fact that he has been detained for three years. A grant of cat deferral does not mean Petitioner gets released. Actually, I misspoke. I meant reinstatement, not remand. The fact that this is mandatory and Ramos was asylum, which was discretionary, would mean that if we agreed with the Petitioner here, it would be a stronger case for reinstatement than Ramos was. Well, Ramos differs in that other facts just more than the discretionary grant of  Like I mentioned, it's cat deferral. He does not get released. He can remain detained. He can be removed to a third country. Cat deferral just says, this man, if you were to grant it, cannot go back to Mexico. That does not mean he does not, he gets released and stays in the United States. Just wanted to make sure that point was noted. Also, we did, like you mentioned, Judge Rossman, the government does defend the board's decision. And in Ramos, the government just wanted remand from the get-go and did not defend the board decision. Allowing this board member, who's clearly trying to get it right, to remand back to the agency would allow, would allow this case to be thoroughly fleshed out. And he could outline the clearly erroneous fact up with the facts that this court were to find that he did not satisfy that standard. Do you agree with the Petitioner's point about how we should understand these standards here? You're brief focused on substantial evidence as your primary framing, and we would not get to that. Is that, could you speak to that? Yes, correct. I agree with Petitioner's counsel. First, you have to address the clear error and whether this court feels that the board did it correctly. And then we would jump to the merits of was it more likely, did Petitioner show it was more likely than not? He bears the burden and substantial evidence would be the standard of review this court would use in reviewing the agency decision. And do you also agree with Petitioner that whether the clear error standard was properly applied is a de novo review for us? Well, Garcia Botella, recently that case made it seem like it was more of a mixed question in law, but I do not believe this court has ruled on that. So I would leave that up to the court. But Garcia Botella does discuss without rendering a decision about what standard of review it was. And CABA doesn't speak to that? CABA does, but Garcia Botella is after CABA. And so if you would look at what this, because Garcia Botella was post Wilkinson, the Supreme Court case. So that would be up to this court. But I do want to say one thing now, again, this court should only be looking at the current decision from 2025. But Petitioner's counsel keeps mentioning these other IJs and two IJs who granted cap. The one IJ who heard Dr. Slack, the expert testimony which Petitioner relies heavily on, that is the immigration judge that denied deferral of removal. I just wanted to note that for the record, because Petitioner's counsel keeps mentioning the fact that two IJs, well, the one IJ who heard the most important expert or testimony favoring, according to Petitioner, deferral of removal, was the IJ that denied deferral. Well, they can argue clear error in reversing the IJ, even though the IJ might well have ruled the other way, viewed the evidence differently. Right. And if the IJ, oh. And so the fact that an IJ listening to the same expert wasn't persuaded really doesn't mean that an IJ who believes the expert, follows the expert, has committed clear error. You agree with that? Correct. I just wanted to point that out because that was brought up quite a few times. And if this court would like, I can go into the facts or would just stay to the clear error. I have no further, nothing further to discuss regarding clear  Well, the facts. We can't, but we can't get to the facts unless clear error. This court were to find the board. Well, whether there was clear error depends a lot on what the facts were before the IJ, right? Correct. But we do not get to whether the substantial agency supports the agency's denial of a likelihood of torture and acquiescence unless we first clear that clear error hurdle. Just descriptively, do you agree that a statement that the BIA made about generalized evidence, the focus on generalized evidence, just descriptively, is just not a fair characterization of this record, given all of the particularized evidence? Yes, there is a, this is a very thorough record. It's over 2,500 pages. I think the board was focusing on general violence because of the violence in Mexico. He's talking about cartel violence. And I think that the board was discussing as general violence, gang violence, cartel violence. But the expert testimony was very particular about specific things that generate, that stimulate gang violence. The fact that he's already a member of a gang or has tattoos showing he had been and therefore members of competing gangs would go after him because of that. And the gang that he presumably left will go after him if he doesn't rejoin. I mean, there was very, it wasn't just generalized gang violence. It was testimony directed at the specifics of this person, how it would be hard for him to get into another part of the country where he might be safer because he doesn't have identification documents and things like that. I don't see how you can categorize the evidence here as generalized. I would say general violence as opposed to generalized. And then going to your... Well, even general violence. It was violence specifically to someone with a gang tattoo. Yes, Your Honors. But it's also, he also talked about anyone suspicious. Well, that can go beyond. So I think that anyone suspicious can go beyond just someone with a gang tattoo. The record, I mean, it can go both ways. He also discussed a safer country or, excuse me, a safer place in Mexico than Juarez, which is where Petitioner is from. So taking the evidence, it can go both ways. Yes, Juarez, where Petitioner was from, is more dangerous than, I think, apologies, I think it was Madeira or something similar where he said it was a safer place. So yes, he spoke of violence in Juarez, but he also provided a place of safety in a different city that he could go to. So I think the evidence can be read... But then he said it would be hard for him to get to another place quick enough to avoid the gang violence in Juarez. No? He was quick enough to get to Juarez. Because he couldn't get the identification papers he needed, it would be hard for him to get out of Juarez in less than 30 days, and that would be enough time for the gangs to... Because they have people watching at the border to see who might be a likely gang member. But he also spoke that to all of people who had lived in the United States returning to Mexico, deportees as a general, which is a vast number. So yes, I think you can read the evidence. Yes, and notably, he never met or interviewed petitioners, so he's just going on generalities of he was a former gang member, he's returning from the United States to Mexico. What is the government's best argument for not remanding here, or for remanding if we disagree with you on clear air? So if we conclude that the BIA did misapply the clear air standard, what is your strongest argument that we should then remand? To provide the board the opportunity to establish a clear outline of what clear air was, what was the factual finding. Give them the opportunity to fix the decision, if this court would find that it did not satisfy the clear air. This is not like Ramos. This is not asylum. He's going to be detained. He could be detained without a list of custody. Could you say a little bit more? I'm not persuaded by just give them another chance. There has to be some real work that needs to be done in front of the BIA on remand for it not to be futile, and maybe there is an opportunity for explanation here that we should remand for, but just simply for the opportunity, I don't find that to be persuasive. So what is the government's position on, specifically, what would be elaborated on here that would make a difference? He could elaborate on using more of the expert testimony and the evidence of record as opposed to just incorporating maybe the IJ decision, highlight specific statements from the IJ decision. You see he says IJ at page 5 to 9. Allow him to expand and what specifically on IJ, excuse me, pages 5 to 9, is problematic or clearly erroneous. Provide him that opportunity. And petitioner, again, would remain detained. So just because in Ramos he was granted asylum, that's a different form of relief. He would be retained or he could be, if this court were to grant it, he could be removed to a third country. So just because it would not, I'm not saying petitioner will remain detained. That's not up to me. That's up to DHS. But if he does remain detained, there's no harm no foul kind of situation. Let the board get it right. Give them another opportunity to, if this court were to find no clear, get it right. There's already been a couple decisions. It's gone both ways. You know, this hasn't been a clear one every time. Grant, Grant, Grant, Grant. You're over time. Okay. But if there are more questions. No, thank you. Thank you. Okay, thank you. Thank you. You have some time, but it's not much. Talk super fast. Counsel said just now at one point the evidence can go both ways. This is Anderson v. City of Bessemer City. If the evidence can go both ways, it's not clearly erroneous. The case was remanded the second time. I'm sorry, the second IJ Archuleta did deny relief because it was based on her. Her predicate factual findings were all clearly erroneous. The board had to overturn her factual findings. It's on page 125 to 128 of the record. She made a lot of findings just out of thin air that were not based on the record. That's why she denied relief. If the court, we don't think remand is necessary here. We think under Ramos the case can be disposed of here. But if the court disagrees and chooses to remand, we would ask that it be strictly limited to the question of the clear error review and not allow the BIA, for example, to send it back to the IJ for more fact-finding and starting all over and dragging this out indefinitely. What about your other issues? I beg your pardon? Your other issues, your legal errors on acquiescence and so forth. If we agree with you on clear error. I think if you agree on clear error, I'm not sure you need to reach acquiescence because the IJ already determined as a finding of fact that the likelihood of torture was over 50%. That's already a finding of fact that's subject to clear error review. So I'm not sure we need to send it back. Actually, the government in their brief argue that the BIA did implicitly do the aggregate analysis. So if the court were to accept the government's argument there and our argument on clear error, I don't think you would need to remand for the aggregate analysis. And then with regard to one more thing, just Escobar-Hernandez cited by the board for this idea of pervasive violence as evidence is not enough. They left out the words by itself. Thank you. Thank you, counsel. Case submitted. Counselor excused. We're going to take a brief recess. Not more than 10 minutes.